# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Case No.:

NETFRONTS, INC., a Utah corporation,

    Plaintiff,

v.

WEBUYHOSTS, INC., a Washington corporation, and NATHAN OULMAN d/b/a ALL RESELLER, INC.,

    Defendant,

## COMPLAINT

Plaintiff NetFronts Inc. ("NetFronts") for its complaint against Defendants WeBuyHosts, Inc. ("WeBuyHosts") and Nathan Oulman ("Mr. Oulman") d/b/a All Reseller, Inc. ("Reseller"), alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. NetFronts is a corporation organized under Utah law with a principal place of business at 1801 Wynkoop Street, #707, Denver, Colorado 80202.

2. Reseller is a sole proprietorship operated by Nathan Oulman. On information and belief, Mr. Oulman resides at 9 Buck Run, Sagle, Idaho 83860.

3. WeBuyHosts is a corporation organized under Washington law whose registered agent, Zack Oulman, may be found at 414 E. College Drive, Wilbur, Washington, 99185.

4. Jurisdiction in this matter is proper pursuant to 28 U.S.C. § 1332 because there is complete diversity and the amount in controversy exceeds $75,000.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and the venue-selection clause contained in the relevant agreement.

## FACTUAL ALLEGATIONS

6. NetFronts is web hosting company based in Denver, Colorado. NetFronts has been providing hosting services since 1996.

7. Reseller previously operated a web hosting business.

8. WeBuyHosts also operates and/or operated a web hosting business. Mr. Oulman was WeBuyHosts' president and CEO at all relevant times.

9. Web hosting, in general terms, is a service that allows individuals and organizations to make their websites accessible to the public via the world wide web. Web hosts typically provide space on a server and internet connectivity.

10. In late 2010, representatives of NetFronts and Mr. Oulman, began negotiating the purchase of Reseller's assets by NetFronts.

11. As part of the negotiations, Mr. Oulman represented that Reseller had customer accounts that generated annual revenue of $235,000. Mr. Oulman provided written evidence in the form of spreadsheets to support his representation regarding the amount of revenue.

12. The amount of annual revenue was critical to NetFronts because it is common practice in the industry to purchase web hosting companies for one times the amount of the annual revenue.

13. The negotiations resulted in execution of an Asset Purchase Agreement ("APA") on or about December 8, 2010.

14. As relevant here, Mr. Oulman and Reseller made the following representations and warranties in the APA:

- That "All Reseller, Inc." was a company incorporated under the laws of the State of Washington; and

- That Reseller had the requisite organization and authority to own, operate, and use its properties to carry on its web hosting business.

15. These representations were false and/or misleading because, in fact, no such company was incorporated under Washington law. In reality, Mr. Oulman was merely operating All Reseller, Inc. as a sole proprietorship and sometimes using the assets and resources of WeBuyHosts to conduct Reseller's business.

16. Under the APA, Reseller further promised:

- That it would transfer to NetFronts all accounts receivable pertaining to Reseller's customer accounts for Reseller's internet hosting, e-mail and managed server customers and all contracts for such services related to the accounts;

- That it would transfer to NetFronts approximately 3,000 active customers that generated an average of at least $17,000 in monthly revenue during the six months prior to the closing date.

- That it would transfer to NetFronts various physical assets, including routers and servers; and

- That it would transfer various domain names and content, including access thereto, to NetFronts.

17. Shortly after the APA was signed in January 2011, and after NetWorks had paid $176,250 in partial consideration of Reseller's assets, NetFronts learned that Reseller's annual revenue was far less than previously represented. In fact, Reseller had overstated its annual revenue by approximately $20,000.

18. On information and belief, the shortage in annual revenue will cause NetFronts future damages in excess of $60,000.

19. In February 2012, as NetWorks was preparing its 2011 taxes, it learned that Reseller, WeBuyHosts, and Mr. Oulman had secretly been receiving payment from customers that should have been transferred to NetFronts.

20. The concealed payments were routed through "Bluepay," a payment gateway used by Reseller. Although NetFronts attempted to deactivate Bluepay, so that payments would go to NetFronts, Reseller's billing program continued to send the payments through Bluepay to WeBuyHosts' merchant account. The payments were then transferred to WeBuyHosts' bank account.

21. Mr. Oulman then withdrew the money from WeBuyHosts' account and used it for personal matters or non-Reseller business.

22. Although WeBuyHosts and Mr. Oulman, had been receiving payments through Bluepay for over a year, Mr. Oulman never mentioned the money to NetFronts.

23. When NetFronts first learned of the wrongful payments in February 2012, the amount of payments misappropriated by Mr. Oulman and WeBuyHosts totaled approximately $30,000.

24. When NetFronts confronted Mr. Oulman about the missing payments and asked Mr. Oulman to return the money, Mr. Oulman told NetFronts that it was his money, and that he had used it to pay the IRS and invest in other business ventures.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### Breach of Contract (Against Reseller and Mr. Oulman)

25. NetFronts incorporates all of its prior allegations as if restated herein.

26. NetFronts entered into an agreement with Mr. Oulman d/b/a Reseller to purchase Reseller's assets.

27. Mr. Oulman and/or Reseller breached the agreement by, among other things, failing to deliver the following to NetFronts:

- All accounts receivable pertaining to Reseller's customer accounts for Reseller's internet hosting, e-mail and managed server customers and all contracts for such services related to the accounts;

- Approximately 3,000 active customers with an average of at least $17,000 in monthly revenue;

- Various physical assets, including routers and servers; and

- Various domain names and content, including access thereto.

28. NetFronts has performed all conditions precedent under the agreement, including payment.

29. The breach of contract by Mr. Oulman and Reseller has caused NetFronts damages in an exact amount to be shown at trial, but presently estimated to exceed $60,000.

## SECOND CLAIM FOR RELIEF
### Civil Theft Under C.R.S. § 18-4-405 (Against All Defendants)

30. NetFronts incorporates all of its prior allegations as if restated herein.

31. Defendants knowingly obtained and/or exercised control over NetFronts' property, including the Bluepay customer accounts and payments related thereto.

32. Defendants did so without authorization from NetFronts.

33. Defendants intended to permanently deprive NetFronts of the use and benefit of the Bluepay customer accounts and payments and Defendants knowingly used and concealed the money from the Bluepay customer accounts in such a manner as to permanently deprive NetFronts of its use or benefit.

34. Defendants' actions have caused NetFronts damages in an exact amount to be shown at trial, but presently estimated to exceed $30,000, and NetFronts is entitled to treble damages, attorneys' fees, and costs.

## THIRD CLAIM FOR RELIEF
### Fraudulent Inducement (Against Mr. Oulman and Reseller)

35. NetFronts incorporates all of its prior allegations as if restated herein.

36. Mr. Oulman d/b/a Reseller made false or misleading representations of fact, including, among other things, that Reseller had $17,000 per month in monthly revenue in the six months prior to the sale of Reseller's assets to NetFronts.

37. Mr. Oulman knew its representations regarding Reseller's revenue were false or Mr. Oulman made them with reckless disregard for their truth or falsity.

38. NetFronts was ignorant of the truth or falsity of Mr. Oulman's representations.

39. Mr. Oulman made the misrepresentations with the intent to induce NetFronts into purchasing Reseller's assets.

40. NetFronts, in fact, relied on Mr. Oulman's representations in setting the purchase price and consummating the APA.

41. NetFronts reliance on Mr. Oulman's representations was justified under the circumstances because Mr. Oulman provided what appeared to be proper documentary support for his factual misrepresentations.

42. NetFronts' justified reliance on Mr. Oulman's false and misleading representations of fact caused NetFronts to suffer damages in an exact amount to be shown at trial but presently estimated to exceed $60,000.

## FOURTH CLAIM FOR RELIEF
### Fraudulent Concealment (Against All Defendants)

43. NetFronts incorporates all of its prior allegations as if restated herein.

44. Defendants concealed the fact that they were receiving payments via Bluepay during 2011 that should have gone to NetFronts.

45. Defendants had a duty to disclose such facts in equity and good conscience.

46. The facts concealed by Defendants were material.

47. Defendants concealed such facts with the intent of creating a false impression of the actual facts in the mind of NetFronts.

48. Defendants concealed such facts with the intent that NetFronts take a course of action that NetFronts might not take if it knew the actual facts.

49. NetFronts took actions, including, among other things, paying Mr. Oulman and Reseller the holdback amount of the purchase price contemplated in the APA, in reliance on the assumption that the facts concealed by Defendants were different from what they actually were.

50. NetFronts also refrained from taking actions, including, among other things, unwinding the APA, in reliance on the assumption that the facts concealed by Defendants were different from what they actually were.

51. NetFronts' reliance was justified because NetFronts deactivated the Bluepay gateway and it was reasonable for NetFronts to expect that Defendants would disclose the receipt of approximately $30,000 in money that rightfully belonged to NetFronts.

52. NetFronts' reliance on Defendants' concealment caused NetFronts to suffer damage in an exact amount to be shown at trial.

## FIFTH CLAIM FOR RELIEF
### Tortious Interference With Contract (Against All Defendants)

53. NetFronts incorporates all of its prior allegations as if restated herein.

54. NetFronts had existing contracts with its customers in which the customers were to pay NetFronts.

55. Defendants knew or reasonably should have known of NetFronts' customer contracts.

56. Defendants by, among other things, failing to provide NetFronts' with access to payment gateways and failing to disclose the concealed Bluepay payments, intentionally interfered with NetFronts' customer contracts.

57. Defendants' interference with NetFronts' customer contracts was improper because it was fraudulent, deceptive, and unlawful.

58. Defendants' interference with NetFronts' customer contracts has caused NetFronts damages in an exact amount to be shown at trial.

## SIXTH CLAIM FOR RELIEF
**Unjust Enrichment (Against Mr. Oulman and Reseller)**

59. NetFronts incorporates all of its prior allegations as if restated herein.

60. Mr. Oulmand and Reseller received a benefit in the form of payment by NetFronts.

61. Mr. Oulman and Reseller's benefit came at NetFronts' expense because NetFronts did not receive the customer accounts and revenue it was promised.

62. Under the circumstances of this case, it would be unjust for Mr. Oulman and Reseller to retain the benefit it received from NetFronts without repayment.

## SEVENTH CLAIM FOR RELIEF
**Breach of Duty of Good Faith and Fair Dealing**
**(Against Mr. Oulman and Reseller)**

63. NetFronts incorporates all of its prior allegations as if restated herein.

64. NetFronts entered into a contract with Mr. Oulman and Reseller for the purchase of Reseller's assets and Colorado law implies a duty of good faith and fair in NetFronts' contract with Mr. Oulman and Reseller.

65. NetFronts performed all its obligations under the contract, including payment.

66. Mr. Oulman and Reseller breached the duty of good faith and fair dealing by, among other things, failing to reasonably transfer the Bluepay gateway to NetFronts and/or failing to provide NetFronts the access to Bluepay to permit NetFronts to change the Bluepay gateway.

67. As a result of the breach of the implied duty of good faith and fair dealing by Mr. Oulman and Reseller, NetFronts has suffered damages in an exact amount to shown at trial.

## **JURY DEMAND**

NetFronts respectfully requests a trial by jury on all claims so triable.

WHEREFORE, NetFronts requests that the Court enter judgment in its favor and against Defendants, and that the Court order the following relief:

a) Monetary damages in NetFronts favor in an amount to be determined at trial, but presently estimated to exceed $90,000;

b) Treble and/or exemplary damages pursuant to C.R.S. § 18-4-405;

c) Attorneys' fees and costs to the extent permitted by law;

d) Pre- and Post-judgment interest; and

e) Such other relief as the Court deems appropriate.

Dated: August 28, 2013.

Respectfully submitted,

By: /s/ Ryan E. Warren
    Ryan E. Warren, #33605
    Thomas H. Wagner, #38135
    Polsinelli PC
    1515 Wynkoop, Suite 600
    Denver, CO 80202
    Telephone:  303.572.9300
    Facsimile:  303.572.7883
    Email:  rwarren@polsinelli.com
          twagner@polsinelli.com

Plaintiff's Address:

1801 Wynkoop Street, #707
Denver, Colorado 80202