## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is entered into by NetFronts, Inc., a company established in Colorado (the "Purchaser"), and All Reseller, Inc., a company incorporated under the laws of the State of Washington (the "Seller"), and is entered into on this 8th day of December, 2010.

### Background Statements

Purchaser desires to acquire certain of the aspects of Seller's business, including the physical assets and client contracts set out below and on Exhibit A, which is attached to this Agreement, and made a part of it by this reference (the "Assets"), and Seller desires to sell those Assets to Purchaser, in a transaction in which Purchaser acquires all of Seller's interests in and to the Assets, and Seller retains all liability for any obligations related in and to the Assets, other than those liabilities expressly assumed by Purchaser, as set out herein (the "Contemplated Transaction").

Now, therefore, in consideration of the foregoing and the respective representations, warranties, encumbrances, covenants, and agreements set forth herein, the parties hereto agree as follows:

Article 1.   Purchase and Sale of Assets

1.1.   Purchase and Sale of Assets

On the terms and subject to the conditions set forth in this Agreement, upon payment by Purchaser of the Purchase Price, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all of Seller's rights, title and interests wherever located, whether tangible or intangible, free and clear of any liabilities whatsoever, other than those liabilities expressly assumed by Purchaser as set out herein, as the same shall exist as of the date of Seller's signature hereto in the Assets.  The Assets shall include all of Seller's rights, title and interests in and to such assets, properties, rights and claims described in paragraphs 1.1.1 through 1.1.6:

   1.1.1.   Any and all related Internet hosting, e-mail and managed server customers and all contracts for such services related to the Assets (the "Customer Accounts");

   1.1.2.   The domain name and all content present on, and associated with, the websites present at the urls bravidio.com, allreseller.com, webuyhosts.com, livehost.net, mphosting.net, bluecapacity.com, intersabre.com, abnhosting.com, anrhost.com, jetnethost.com, surfsidehost.com, dailydns.com, dailydns.net, tagbridge.net, imagelinkusa.net, cheapwebhost.us, allprohost.com, ebizalive.com, bobhosting.com, hostingcore.com, hostingforsites.com, cshelpdesk.net, honestwebhost.com, gotonames.com, pc-core.net, cpanelhosting.net, 30u.com;

   1.1.3.   Routers and servers including e-mail, web, authentication, DNS and billing and related software licenses, plus any other equipment and/or software required to support the customer base as set out on Schedule 1.1.3;

   1.1.4.   All accounts receivable pertaining to the Customer Accounts;

   1.1.5.   All IP addresses associated with the Assets; and

   1.1.6.   All telecommunications and bandwidth contracts set out on Schedule 1.1.7

1.2.   Excluded Assets

   All of Seller's assets not set out on Exhibit A and in paragraphs 1.1.1 through 1.1.6.

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 1 of 32*

**EXHIBIT A**

1.3. Assumed and Excluded Liabilities

1.3.1. Assumed Liabilities

Purchaser shall assume only those liabilities set out on Schedule 1.3.1 (the "Assumed Liabilities").

1.3.2. Excluded and Assumed Liabilities

Purchaser shall not assume, or in any way be liable or responsible for, any liabilities, commitments, or obligations of Seller. Without limiting the generality of the foregoing, the Purchaser shall not assume, and the Seller shall remain responsible for the following specific items (the "Excluded Liabilities"):

1.3.2.1. Purchaser assumes no liabilities, commitments, or obligations of Seller for the Acquired Assets, whether such liabilities, commitments, or obligations are known, unknown, asserted, unasserted, discovered, discoverable, or undiscoverable. Responsibility for all such liabilities shall lay with Seller. Subsequent to the Closing Date, as that term is described below, Purchaser shall be responsible for any and all liabilities related to the Assets, to the extent, and only to the extent, that such liabilities accrued subsequent to the Closing Date and are solely based on Purchaser's acts. However, nothing in this Paragraph 1.3.2.1, nor in this Agreement, shall be interpreted to mean that Purchaser has "assumed" any liabilities, as that term is understood under the laws governing this Agreement other than those set out in paragraph 1.3.1 entitled "Assumed Liabilities;"

1.3.2.2. Any debts incurred by the Seller that are attached to the Assets must be promptly disclosed to the Purchaser, and the Seller may directly pay any and all payments relating thereto to satisfy the outstanding debt or have Purchaser assume such debt as partial payment of the Purchase Price;

1.3.2.3. Any obligations or liabilities for any fees or expenses of professional persons (including any attorney, consultant or financial advisor) employed or retained by Seller in connection with this Agreement or any of the Assets;

1.3.2.4. Any claims whatsoever against current or former directors, officers or other employees of, or agents, accountants or other advisors of, or to, the Seller;

1.3.2.5. Any liabilities or obligations (whether absolute, contingent, or otherwise) which accrue with respect to, arising out of, or related to, the Assets on or prior to the Closing Date, including any liability or obligation of Seller or any of its employees, directors, officers, affiliates, or agents arising out of, relating to, or caused by (whether directly or indirectly), Seller's ownership, possession, operation, interest in, use or control of the Assets;

1.3.2.6. Any liabilities or obligations of Seller for any taxes of any kind accrued for, applicable to, or arising from any period (or portion thereof) ending on or prior to the Closing Date, other than transfer taxes imposed specifically on the transfer of the Assets from Seller to Purchaser, that do not include any other type of tax or assessment incurred prior to the Closing Date;

1.3.2.7. Any liabilities or claims arising out of or in connection with any indebtedness of Seller or any of its affiliates;

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 2 of 32*

    1.3.2.8. Any and all liabilities arising from any litigation, investigation or other proceeding pending or threatened in respect of Seller or any of its officers, directors, representatives or agents or, to the extent relating to any transaction or event occurring on or prior to the Closing Date, in respect of the Assets;

    1.3.2.9. Any liabilities or obligations of Seller for any accounts payable related to the Assets of any kind (including without limitation the Assumed Contracts) accrued for, applicable to, or arising from any period (or portion thereof) ending on or prior to the Closing Date; and

    1.3.3. Any corporate or organizational liabilities associated with Seller.

Seller agrees that it will remain responsible for the payment or the discharge of the Excluded Liabilities, including those not specifically set out above, but which remain Excluded Liabilities by definition.

1.4.    Consideration

The consideration for the Acquired Assets and License shall be ▆▆▆▆ paid as set out in Article 2.2.3 ("Purchase Price"). Purchaser shall pay the Purchase Price to Seller as set out in Article 2 below. The Purchase Price shall be paid, adjusted and distributed as is fully set out in Article 2.2.3 below. Seller expressly agrees and understands that the Purchase Price may be decreased based upon the occurrence or non-occurrence of certain conditions as set out below and in the Agreement, and agrees that such the adjusted Purchase Price shall constitute full consideration.

Article 2.    The Closing

2.1.    Closing

The closing of the contemplated transaction (the "Closing") shall occur at 10:00 am at Purchaser's corporate headquarters, after the conditions set forth in this Agreement shall have been satisfied or waived or at such other time, date and at such place as shall be fixed by agreement among the Purchaser and the Seller (the "Closing Date").

2.2.    Closing Sequence

Closing of this Agreement shall be accomplished as set out below. Should one party fail to fulfill its obligations, and the Contemplated Transaction fail to "Close," the Agreement shall terminate pursuant to Article 7 entitled "Termination."

    2.2.1. Transfer of Acquired Assets. On the Closing Date Seller shall deliver to Purchaser the Acquired Assets and deliver all "Seller's Deliverables" as they are set out in Paragraph 2.3.1 below. Failure to deliver the Acquired Assets and all of Seller's Deliverables by this date shall entitle Purchaser to terminate this Agreement.

    2.2.2. Distribution of the Purchase Price. Upon transfer of the Acquired Assets to Purchaser's servers and transfer of all tangible Assets to Purchaser's facility, Purchaser shall begin to make the payments to Seller as set out in Paragraph 2.2.3. At that time, the Acquired Assets shall become the property of Purchaser according to the terms hereof. The Purchase Price may be allocated amongst the specific purchased Assets within the manner determined by Purchaser.

    2.2.3. The Purchase Price shall be paid by Buyer to Seller as follows:

        (i)    ▆▆▆▆ on the Closing Date; and

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 3 of 32*

    (ii) ▇▇▇▇ thirty days from the Closing Date (the "Holdback").

  2.2.4. Seller will be responsible for all chargebacks that result from transactions occurring prior to Closing Date which shall be deducted from the Holdback.

  2.2.5. Purchaser may also deduct from the Holdback (i) any amounts due Purchaser pursuant to this Agreement; (ii) an amount equivalent to the difference between the revenue actually received from the Customer Accounts two days prior to the date the Holdback is due, and the amount provided to Purchaser during due diligence; (iii) any amounts not paid to Seller's vendors who provide services necessary to the proper functioning of the Assets; and/or (iv) chargebacks.

2.3. Deliveries at Closing

  2.3.1. Seller's Deliverables

Subject to the terms and conditions hereof, for Closing to occur, the Seller shall deliver, or cause to be delivered, to the Purchaser or its permitted assigns, the following:

All documents, certificates, court orders and agreements reasonably necessary to transfer to the Purchaser all of Seller's right title and interest in, to and under all of the Acquired Assets, free and clear of any and all encumbrances thereon other than Permitted Encumbrances, including (i) an executed Assignment and Assumption Agreement, set out as Exhibit B, with respect to any software licenses, inventions, code, or other Intellectual Property associated with the Assets, together with any necessary transfer declarations or other filings (in recordable form if required by Purchaser); (ii) a Bill of Sale, set out as Exhibit C, to effect the transfer of any tangible property associated with the Assets; (iii) an Intellectual Property Assignment, set out as Exhibit D,, together with any necessary transfer declarations or other filings (and in recordable form if require by the Purchaser).

Article 3. Representations and Warranties of the Seller

3.1. Organization

The Seller has the requisite organization power and authority to own, use, and operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted except whether the failure to be so validly existing would not reasonably be intended to, individually or in the aggregate, result in a Material Adverse Effect.

3.2. Authority

Seller has the power and authority to enter into this Agreement and to carry out its obligations hereunder. The execution, delivery, and performance of this Agreement by Seller and the consummation by Seller of the Contemplated Transaction has been duly authorized by all requisite actions. Further, that this Agreement has been duly and validly executed and delivered by or on behalf of the Seller and constitutes a valid and binding agreement of the Seller, enforceable against the Seller.

3.3. No Violations

Neither the execution, delivery, or performance of this Agreement by Seller, nor the consummation by Seller of the Contemplated Transaction, nor compliance by Seller with any of the provisions hereof, will (i) result in a violation, or breach of, or constitute (without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, vesting, payment, exercise, acceleration, suspension, or revocation) under any of the terms, conditions, or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, license, contract, agreement, plan, or other instrument or obligation to which

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 4 of 32*

Seller is a party or by which Seller's properties or assets may be bound or affected, (ii) violate any order, writ, injunction, decree, statute, rule, or regulation applicable to any Seller or to the Acquired Assets, or (iii) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Acquired Assets.

3.4.   No Litigation

There is no suit, action, proceeding, or investigation (whether at law or equity, before or by any federal, state, or foreign commission, court, tribunal, board, agency, or instrumentality, or before any arbitrator) pending, or threatened against (including, but not limited to, lawsuits dismissed without prejudice), or affecting Seller related to the Assets, which if adversely decided would be reasonably likely, individually or in the aggregate, to have a Material Adverse Effect, nor is there any judgment, decree, injunction, rule, or order of any court, governmental department, commission, agency, instrumentality, or arbitrator outstanding against Seller that would be reasonably likely to have a Material Adverse Effect. Further that Seller has listed on Schedule 3.4 each outstanding subpoena, warrant, demand, request for information or any other similar document which compels Seller to produce, retain, or otherwise disclose information.

3.5.   Intellectual Property

Seller owns, or has procured a license to use, which is fully transferable to Purchaser, all Intellectual Property associated with the Assets. Further, Seller represents and warrants that such licenses are freely transferable to Purchaser, without any additional cost or expense to Purchaser, and that it has the proper licenses for any and all software and all other Intellectual Property associated with the Assets requiring such a license, and that Seller has, or will on the Closing Date, effect such a transfer. In addition, Seller has procured assignment of invention, or similar agreements from its employees, contractors or other vendors in which each have transferred their intellectual property rights associated with the Acquired Assets to Seller. No third party has asserted against Seller a claim that the third party claims superior, joint or common ownership, including any claim of right or license that allows a third party to use any Intellectual Property that is owned by Seller. Nor has any third party asserted against Seller a claim that the use, license, sale or lease of any Intellectual Property, or that the conduct of Seller's business infringes, misappropriates or contributes to the infringement of any patent claim, copyright, trade secret or other intellectual property rights of any third party in any jurisdiction in which Seller conducts its business.

3.6.   Agreements

Seller has delivered to Purchaser a correct and complete copy of each written agreement (as amended to date) related to the Assets, and/or a written summary setting forth the terms and conditions of each oral agreement related to the Assets. With respect to each such agreement: (i) the agreement is legal, valid, binding, enforceable and in full force and effect; (ii) the agreement will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the consummation of the truncations contemplated hereby; (iii) no party is in breach or default, and no event has occurred which with notice or lapse of time would constitute a breach or default, or permit termination, modification, or acceleration, under the agreement; and (iv) no party has repudiated the agreement. To the extent that any such agreement requires consent or waiver of the other party to remain in existence, or to be assigned by Seller, without triggering a termination or any other similar right of such party as a result of the transactions contemplated by this Agreement, Seller has informed Purchaser in writing of such a right. Should any such consent or waiver be necessary subsequent to the Closing Date, any Payment due Seller shall be reduced by (i) the reasonable legal fees charged to Purchaser in association with such a consent, and (ii) any increase in fees due, or, should the agreement be terminated, any increase in fees associated with the procurement of substitute goods, services or software.

3.7.   Tangible Assets

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 5 of 32*

All assets (including all servers and other computer equipment), has been maintained in accordance with normal industry practice, is in operating condition and repair (subject to normal wear and tear), and is suitable for the purposes for which it presently is used and presently is proposed to be used.

3.8.   Undisclosed Liabilities

Seller has no knowledge of any liability that a reasonable businessman would believe affected title to, or use of, the Assets (and there is no basis for any present or future legal action, suit, proceeding, hearing, or investigation, against it giving rise to any Liability), except for liabilities disclosed on Schedule 3.8.

3.9.   Works Made for Hire

No third party that developed or assisted in the development of any of Seller's Intellectual Property has presented Seller with any written claim alleging ownership or other valid right to use, license, dispose of or otherwise distribute any Seller products which incorporate Intellectual Property owned by Seller.

3.10.   Acceptable Uses

Seller's websites used to offer and provide services to Seller's customers include an acceptable use policy, terms of service, and a privacy policy that meet industry standards applicable to similarly situated businesses, and are sufficient to give Seller the discretion to manage issues that relate to third party and governmental complaints regarding the content of Seller customer websites, without violating the terms of customer agreements or otherwise giving rise to liability.  Seller's website content policies allow third parties to submit complaints relating to the infringement or alleged infringement of intellectual property rights of a third party in accordance with all U.S. federal laws, rules and regulations, including without limitation, compliance with 17 U.S.C. §512 as amended and as now in effect.

3.11.   Survival

On the Closing Date, all representations and warranties set out in this Article 3 shall expire except as expressly set out herein. Only Seller's warranties set out in Paragraphs 3.2 and 3.4 above, shall survive Closing.

Article 4.   Representations and Warranties of the Purchaser

Purchaser represents and warrants to Seller as follows:

4.1.   Organization

Purchaser is a legal entity validly existing under the laws of the jurisdiction of its incorporation or organization and has the requisite organization power and authority to own, use, and operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted except where the failure to be so validly existing would not reasonably be extended to, individually or in the aggregate, result in a Material Adverse Effect.

4.2.   Authority

Purchaser has the corporate and other organizational power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution, delivery, and performance of this Agreement by Purchaser and the consummation by Purchaser of the Contemplated Transactions have been duly authorized by all requisite actions.  Further, that this Agreement has been duly and validly executed and delivered by or on behalf of, Purchaser and constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser.

4.3.   Survival

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 6 of 32*

On the Closing Date, all representations and warranties set out in this Article 4 shall expire except as expressly set out herein.

## Article 5. Covenants

### 5.1. Public Announcements

Purchaser and Seller agree that they will not issue any press release or respond in writing to any press inquiry with respect to this Agreement or the Contemplated Transaction without the prior approval of the other, which approval may be withheld for any or no reason.

### 5.2. Additional Matters

Subject to the terms and conditions herein provided, each of the parties hereto agrees to use all reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable under applicable laws and regulations to consummate and make effective the Contemplated Transaction.

The Purchase Price shall be inclusive of transitional services to be provided by Nathan Oulman for a reasonable transition period of up to a maximum of ninety (90) days from the Closing Date. Nathan Oulman shall do such things, and undertake any tasks reasonably requested of him by Purchaser. From that point forward, for up to one year, the Seller agrees to make Nathan Oulman available on an infrequent, "as-needed," basis to the Buyer to provide assistance by telephone.

### 5.3. Further Assurances

In addition to other provisions set out herein, from time-to-time after the Closing Date, Seller and Purchaser will use all reasonable best efforts to execute and deliver such other instruments of conveyance, transfer, or assumption, as the case may be, and take such other action as may be reasonably requested to implement more effectively the Contemplated Transactions.

### 5.4. Non-Disclosure

Following the Closing Date Seller shall not, directly or indirectly, disclose, divulge or make use of any trade secrets or other information of a business, financial, marketing, technical or other nature pertaining to Seller's business or the transactions contemplated hereby, except as necessary to file tax returns or other required reports with governmental agencies or as otherwise required by law.

Seller shall not, directly or indirectly, disclose, divulge or make use of any confidential or proprietary information pertaining to the Purchaser which the Purchaser has disclosed to Seller. If this Agreement is terminated, Seller will deliver to the Purchaser all confidential and proprietary information pertaining to and all documents and other material obtained from the Purchaser.

### 5.5. Non-Competition

Seller shall enter into and execute the non-competition agreement set out as Exhibit E.

### 5.6. Injunctive Relief; Limitation on Scope

Seller acknowledges that any breach of the provisions of paragraphs 5.6 and 5.7 of this Agreement will cause irreparable injury to the Purchaser for which an adequate monetary remedy does not exist. Accordingly, in the event of any such breach, the Purchaser shall be entitled, in addition to the exercise of any other remedies, to seek and obtain injunctive relief restraining the Sellers from committing such breach.

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 7 of 32*

5.7. Miscellaneous

Each party represents to the other that there are no other brokers involved in this transaction. Each party shall be responsible for compensating their brokers.

Article 6.   Conditions Precedent

6.1. Conditions Precedent to Seller's and Purchaser's Obligations

    6.1.1. No statute, rule, regulation, executive order, decree, decision, ruling, or preliminary or permanent injunction shall have been enacted, entered, promulgated, or enforced by any U.S. federal or state court or foreign governmental authority that prohibits, restrains, enjoins, or restricts the consummation of the Contemplated Transaction that has not been withdrawn or terminated.

    6.1.2. No claim, action, suit, arbitration, inquiry, proceeding or investigation shall have been commenced and remain pending by or before any United States federal, state, local or foreign governmental, regulatory, or administrative authority, agency, or commission or any court, tribunal or judicial or arbitral body against the Purchaser or Seller, seeking to restrain or materially and adversely alter the Contemplated Transaction.

6.2. Conditions Precedent to the Obligations of Seller

The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all respects.

6.3. Conditions Precedent to the Obligations of Purchaser

    6.3.1. Seller shall have performed in all material respects its obligations under this Agreement required to be performed by it at or prior to the Closing Date;

    6.3.2. The representations and warranties of Seller contained in this Agreement shall be true and correct in all respects; and

    6.3.3. Sellers shall have obtained any consents required to transfer their rights, title and interest in the Acquired Assets.

    6.3.4. The Seller will transfer at Closing approximately 3000 active customers that have averaged in the months prior to the Closing Date at least $17,000 in monthly revenue over the prior six months at the Closing Date.

    6.3.5. The Seller's Deferred Revenue does not exceed $45,000 at closing.

    6.3.6. For purposes of the above, an "active customer" shall be defined as any and all customers whose account is in good standing and for which monies are currently collected within a reasonable amount of time for the provided service(s). Any and all customers who have an account for which no money is collected (e.g. deadbeat, employee, "compensated" or "gratis" accounts) or whose account has been deactivated due to lack of payment or other reasons and/or have not been suspended for lack of payment shall not be considered active customers.

Article 7.   Termination

7.1. Material Default or Breach

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 8 of 32*

This Agreement may be terminated and the Contemplated Transaction may be abandoned at any time prior to the Closing Date if a material default or material breach shall be made by either Seller or Purchaser with respect to the due and timely performance of any of its covenants or agreements contained herein, or if its representations or warranties contained in the Agreement shall have become inaccurate (without giving effect to any materiality or Material Adverse Effect qualifications or exceptions contained therein) and such inaccuracy has had or would reasonably likely to have, individually or together with other such inaccuracies, a Material Adverse Effect.

7.2.   Procedure and Effect of Termination

In the event of termination and abandonment of the Contemplated Transactions pursuant to this Article, written notice thereof shall forthwith be given to the other parties to this Agreement and this Agreement shall terminate and the Contemplated Transaction shall be abandoned, without further action by any of the parties hereto. If this Agreement is terminated as provided herein, no party hereto shall have any liability or further obligation to any other party to this Agreement resulting from the termination except (i) that the provisions of paragraph 5.1 ("Public Announcements"), this paragraph 7.2 ("Procedure and Effect of Termination"), paragraph 9.1 ("Notices"), and paragraph 9.5 ("Amendment"), shall remain in full force and effect and (ii) no party waives any claim or rights against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement.

Article 8.   Indemnification

Seller shall indemnify and hold Purchaser harmless from, and at its own expense agrees to defend, or at its option to settle, any claim, suit or proceeding brought or threatened against Purchaser so far as it is based on a claim that (i) Purchaser is liable for contributory copyright infringement based, in part, on Seller's failure to follow the procedures of 17 U.S.C. §512 commonly known as the Digital Millennium Copyright Act; (ii) Seller has failed to report child pornographic material hosted by it of which it had knowledge; (iii) Seller has not complied with any law or regulation prohibiting gambling; and (iv) Seller breaches any warranties. This paragraph will be conditioned on Purchaser's notifying Seller promptly in writing of the claim and giving Seller full authority, information, and assistance for the defense and settlement thereof. However, Purchaser's failure to do so shall not be construed as waiving its right to indemnification hereunder, unless such a failure materially prejudices Purchaser's defense. Purchaser shall have the right to participate in the defense of the claim at Purchaser's expense.

Article 9.   General Provisions

9.1.   Notices

All notices, claims, demands, and other communications hereunder shall be in writing and shall be deemed given upon (i) confirmation of receipt by the addressee by a standard overnight carrier, or (ii) the expiration of ten Business Days after the day when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following address:

If to Purchaser:

Chris Marks, President
NetFronts, Inc.
1801 Wynkoop Street
Suite 707
Denver, CO  80202

With a copy to, which shall not constitute notice:

David Snead

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 9 of 32*

Attorney at Law
Attention: NetFronts, Inc. Legal Notices
P.O. Box 48010
Washington, D.C. 20002
Fax: 202-318-4089

If to Seller:

All Reseller
[ADDRESS]
[ADDRESS]
Wilbur, WA 99185

9.2.  Descriptive Headings

The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

9.3.  Entire Agreement, Assignment

This Agreement (including Exhibits and Schedules) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties, with respect to the subject matter hereto.  This Agreement and the rights and obligations, may be assigned by either party upon notice to the other, provided that such an assignment does not, in any material way, affect the transfer of the Assets from Seller to Purchaser.

9.4.  Governing Law

This Agreement shall be governed by the laws of the State of Colorado without regard to its choice of law rules.  Federal courts located in the City and County of Denver, State of Colorado shall have sole and exclusive jurisdiction over this Agreement.  All actions relating to this Agreement shall be brought in the appropriate federal court sitting in the district for the city set out above.  The parties expressly agree that jurisdiction is proper in the court set out in this paragraph. The parties agree that these courts shall have exclusive jurisdiction over all disputes and other matters relating to the interpretation and enforcement of this Agreement or any other document entered into by the parties. Further, the parties agree that venue shall be proper in the appropriate court set out above, and agree that they shall not contest notice from that court.

9.5.  Amendment

Except as otherwise expressly provided herein, this Agreement (including the Exhibits and Schedules) may not be amended except by an instrument in writing signed on behalf of all parties hereto.

9.6.  Waiver

At any time prior to the Closing Date, the parties hereto may (i) extend the time for the performance of any obligations or other acts of the other parties hereto, (ii) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

9.7.  Counterparts – Effectiveness

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 10 of 32*

This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement. This Agreement shall become effective when each party hereto shall have received counterparts thereof signed by all the other parties thereto.

9.8. Severability

If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereby, and to such end, the provisions of this Agreement are agreed to be severable. Nothing in this Agreement, express or implied, is intended to confer upon any person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

9.9  Attorneys Fees

In any suit or proceeding relating to this Agreement, the prevailing party will have the right to recover from the other its costs and reasonable fees and expenses of attorneys, accountants, and other professionals incurred in connection with the suit of proceeding, including costs, fees and expenses upon appeal, separately from and in addition to any other amount included in such judgment. This provision is intended to be severable from the other provisions of this Agreement, and shall survive and not be merged into any such judgment.

Article 10.   Definitions

10.1.  Defined Terms

As used herein, the terms below shall have the following meanings.

"Intellectual Property" shall mean all of the following as they exist in all jurisdictions throughout the world, in each case, used in Seller's conduct of the Acquired Assets as conducted on the date hereof or at any time since Seller commenced operation:

(i) patents, patent applications, and other patent rights (including any divisions, continuations, continuations-in-part, substitutions, or reissues thereof, whether or not patents are issued on any such applications and whether or not any such applications are modified, withdrawn, or resubmitted);

(ii) trademarks, service marks, trade dress, trade names, brand names, designs, logos, domain names, or corporate names, whether registered or unregistered and all registrations and applications for registrations thereof;

(iii) copyright registrations, applications for registration thereof, and non-registered copyrights;

(iv) trade secrets, designs, research, processes, procedures, techniques, methods, know-how, data mask works, software licenses, inventions, and other proprietary rights (whether or not patentable or subject to copyright, mask work or trade secret protection);

(v) all internet protocol addresses and domain names, including any variations on current domain names whether registered or not; and

(vi) all databases and all collected data and all rights therein throughout the world.

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 11 of 32*

"Legal Proceeding" means any judicial, administrative, regulatory or arbitral proceeding, investigation or inquiry or administrative charge or complaint pending at law or in equity before any domestic or foreign governmental or regulatory body or authority.

"Material Adverse Effect" means any events, conditions, or matters in respect of the web hosting business of Seller or Purchaser, as the case may be, which would result in or would reasonably be extended to result in (i) a material adverse effect on the properties, results of operations (financial or otherwise) of the Assets (in the case of Seller) or the web hosting business of Purchaser or (ii) a material adverse effect on the ability of the Seller or the Purchaser to perform their respective obligations hereunder.

"Person" means any natural person, firm, partnership, limited liability company, association, corporation, trust, business trust or other entity.

**[Remainder of Page Left Intentionally Blank]**

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 12 of 32*

In Witness Whereof, Seller and Purchaser have caused this Agreement to be executed on their behalf by their respective officers thereunto duly authorized, as of the dates written below their names.

Purchaser

*Christopher Marks*

Signature

Christopher Marks

Printed name

President

Title

12/20/2010

Date of Signature

Seller

*[signature]*

Signature

Nathan Oulman

Printed name

CEO

Title

12-10-10

Date of Signature

*Asset Purchase Agreement*
*Entered into by and between NetFronts, Inc. and All Reseller*
*Confidential to the parties*
*Page 13 of 32*